## Commonwealth *vs.* Kyle Washington
### (and two companion cases[1]).

Hampden. May 8, 2007. - July 17, 2007.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Cordy, JJ.

*Controlled Substances. Threshold Police Inquiry. Constitutional Law,* Search and seizure, Stop and frisk, Probable cause. *Search and Seizure,* Threshold police inquiry, Exigent circumstances, Probable cause. *Evidence,* Hearsay, Joint venturer. *Practice, Criminal,* Hearsay.

A Superior Court judge correctly denied the criminal defendants' motions to suppress evidence obtained as a result of an order to get out of their vehicle and a patfrisk, where there was probable cause to arrest the defendants for participating in an illegal drug transaction, and crucial evidence of that transaction (a number of bills folded in half and double wrapped in an elastic band) would have been lost if the police had not searched immediately; further, the fact that the police did not arrest the defendants at the time of the exit order and patfrisk did not change the analysis. [480-487]

At a criminal trial, the judge did not err in admitting in evidence the hearsay testimony of certain statements made by a coventurer with the defendants, where the statements were made during the pendency of the criminal enterprise and in furtherance of it. [487-488]

The evidence at a criminal trial was sufficient to convict the defendant as a principal of trafficking in twenty-eight grams or more of cocaine, where the defendant delivered a package of cocaine to a coventurer to give to an undercover State trooper. [488-489]

Indictments found and returned in the Superior Court Department on December 20, 2001.

Pretrial motions to suppress evidence were heard by *Thomas J. Curley, Jr.,* J., and the cases were tried before *Daniel A. Ford,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Steven J. Brooks* for Aaron Thomas.

*Leslie W. O'Brien* for Kyle Washington.

---

[1]Both against Aaron Thomas.

*Matthew J. Shea,* Assistant Attorney General, for the Commonwealth.

COWIN, J. The defendant, Kyle Washington, and the codefendant, Aaron Thomas, were convicted by a jury in the Superior Court of trafficking in twenty-eight grams or more of cocaine, in violation of G. L. c. 94C, § 32E (*b*) (2). On appeal, the two primarily challenge the denial of their motions to suppress evidence obtained as a result of an order to exit their vehicle and a patfrisk. They also challenge the admission at trial of certain hearsay statements of a coventurer, and the sufficiency of the evidence warranting a conviction of the codefendant as a principal. We transferred the cases here on our own motion, and we now uphold the denial of the motions to suppress and affirm the convictions.

*Facts.* We summarize the pertinent facts from the judge's findings on the motion to suppress, supplemented where appropriate by uncontroverted testimony from the suppression hearing. We reserve for later discussion the facts relevant to the issues arising at trial.

a. *The undercover investigation.* This case has its genesis in a State police undercover operation targeting an individual named Dennis Garafolo, who was suspected of involvement in various crimes, including drug dealing. As part of this investigation, a State trooper made several undercover purchases of cocaine from Garafolo. On February 15, 2001, the trooper purchased more than one hundred grams of cocaine from Garafolo at a bar in Springfield. On March 27, 2001, the trooper again met with Garafolo at the same bar to purchase cocaine. It was a "very quiet" night at the bar with few patrons present. The trooper observed the codefendant enter the bar, walk into a separate rear section where there were few people, and leave that area less than one minute later. Just as the codefendant walked into this rear section, Garafolo, who could see the codefendant going in, asked the trooper for the purchase money for the drugs. The trooper gave him $2,400 in cash. Garafolo walked into the same rear section and returned with the cocaine, which he then gave discreetly to the trooper.

On April 18, 2001, the trooper met with Garafolo to buy cocaine once more, this time at another bar. The trooper gave

Garafolo $2,400 in cash, folded in half and double wrapped with an elastic band. The trooper was instructed to wait in the parking lot while Garafolo went into the bar. However, after waiting about two or three minutes, the trooper followed Garafolo into the bar. He approached Garafolo and indicated impatience to conclude the deal. Garafolo responded that "his guys were there" (by which the trooper understood him to mean his suppliers), and indicated that he would be meeting them shortly in the restroom.[2]

The trooper sat at the bar and saw Garafolo go into the restroom, accompanied by the defendant. About one minute later, Garafolo emerged from the restroom engaged in "friendly conversation" with both defendants. The defendants and Garafolo approached the trooper. The trooper asked Garafolo and the codefendant for the best route to the eastbound Massachusetts Turnpike, and both men made suggestions. The trooper next went outside with Garafolo, who then gave him the package of cocaine the trooper had purchased. The defendants left and got into a car.

At this point in the investigation, the police were attempting to trace the cocaine to its ultimate suppliers, and did not know the names of the defendants. Through a transmitting device, the trooper provided the defendants' descriptions to surveillance officers who, unknown to the defendants, were positioned outside. The make and license plate number of the defendants' car were noted by another State trooper, who communicated this information to the surveillance officers. In order to learn the defendants' identities and to continue the investigation, the police decided to follow the defendants and conduct a motor vehicle stop. The police did not plan to arrest the defendants at that time.

b. *The stop.* Trooper Crystal Sloan, who was in uniform in a marked cruiser accompanied by another State trooper, was assigned to make the stop. She followed the defendants' car for approximately five to ten minutes, and when the car began traveling more than ten miles per hour over the speed limit, she stopped it. Trooper Sloan approached the driver's side of the vehicle to speak with the codefendant, who was the driver. She asked him for his license and registration, which he produced.

[2]There was some question whether Garafolo said "guys" or "guy," which the motion judge resolved in favor of the plural "guys."

The defendant, who was sitting in the passenger seat, had no identification, but gave his name, date of birth, and Social Security number. The defendants did nothing to make the trooper fear for her safety.

c. *The exit order and patfrisk.* Trooper Sloan returned to her cruiser to check the codefendant's license and determine whether there were any outstanding warrants for either man. While she was waiting for this information, two additional State police officers, Troopers Wilcox and Imelio, both in plainclothes, pulled up behind her cruiser in an unmarked car. They were part of the investigation, and previously had radioed Trooper Sloan to say that they intended to speak with the defendants while posing as members of a special police unit. Trooper Wilcox approached the driver's side of the defendants' car and Trooper Imelio approached the passenger's side. Trooper Imelio asked the defendant to step out, and both defendants got out of the car.[3] Trooper Imelio conducted a patfrisk of the defendant. There was a bulge in the defendant's pocket, and the trooper asked him what it was. The defendant removed a large wad of cash, folded or rolled in half, from his pocket and stated that it was money from the bar where he worked. The police took note of the money but did not confiscate it.

d. *Discovery of further evidence.* Meanwhile, Trooper Sloan had verified that the codefendant had a valid Massachusetts license and that neither defendant had any outstanding warrants. As she returned to the defendants' car, she looked through the open passenger's side door and observed, on the floor, in plain view, a few small "twist-tied" baggies containing a white substance. She also saw three similar items on the pavement outside the passenger's side door. Believing these to contain narcotics, she discreetly alerted the other troopers, but no further action was taken because of the ongoing investigation. Accordingly, the defendants were allowed to proceed. After the

[3]The Commonwealth contests that this was an "exit order," arguing that the trooper merely "asked" the defendants to step out. The motion judge had no need to address this issue, and given the grounds on which we decide this appeal, neither have we. However, we doubt that the defendants, who were not free to leave at this point, would have felt free to refuse the trooper's request. See *Commonwealth* v. *Torres*, 424 Mass. 153, 158 (1997).

defendants left, the police recovered the three baggies from the pavement.

*Procedural history.* The defendants were charged with trafficking in more than twenty-eight grams of cocaine, G. L. c. 94C, § 32E (*b*) (2).[4] The codefendant was indicted in connection with the transactions on March 27 and April 18, 2001, while the defendant was charged with the April 18, 2001, transaction only. They each moved to suppress all evidence of the money observed in the defendant's possession as a result of the patfrisk, as well as the baggies recovered from the street and testimony concerning the baggies seen in the car. While conceding that the police were justified in stopping them to ascertain their identities, the defendants argued that the exit order and subsequent patfrisk violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. The motions were denied and the cases proceeded to trial, where the evidence was substantially similar to that at the suppression hearing.

*Motions to suppress.* We address first the suppression motions from which the central issue on appeal derives. In reviewing a denial of a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error, but conduct an independent review of the judge's ultimate findings and conclusions of law. *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004).

In general, a police search or seizure must be supported by a valid warrant. See *Commonwealth* v. *Tarver*, 369 Mass. 302, 306 (1975). However, it is well settled that, in certain "exigent circumstances" that make obtaining a warrant impracticable, *Commonwealth* v. *Cast*, 407 Mass. 891, 904 (1990), a search or seizure may be justified by probable cause. *Commonwealth* v. *Haefeli*, 361 Mass. 271, 277, 280-281 (1972). One such exigent circumstance is the threat of imminent loss of evidence. See generally *Cupp* v. *Murphy*, 412 U.S. 291, 296 (1973); *Commonwealth* v. *Skea*, 18 Mass. App. Ct. 685, 697 (1984). Here,

---

[4]The defendant also was charged with one count of conspiracy to violate the controlled substances act, G. L. c. 94C, § 40, and the codefendant was charged with two such counts. Those indictments were placed on file and are not before us.

because there was probable cause to arrest the defendants for participating in an illegal drug transaction, and crucial evidence of that transaction would have been lost if the police had not searched immediately, the search of the defendants was justified.

The motion judge determined that, at the time the defendants were stopped, the troopers had probable cause to arrest them for trafficking in cocaine. We agree. "[P]robable cause exists where . . . the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual . . . has committed or was committing an offense." *Commonwealth* v. *Storey*, 378 Mass. 312, 321 (1979), cert. denied, 446 U.S. 955 (1980). Here, the police had just witnessed the defendants emerging from the restroom in conversation with Garafolo, moments after Garafolo had said he would be meeting "his guys" in the restroom to obtain the drugs, and moments before he handed the trooper a package of cocaine. Particularly since the police had direct evidence to believe that the codefendant had participated in a past drug deal with Garafolo, they had probable cause to believe that the defendants had just engaged in an illegal drug transaction.

Because there was probable cause to arrest, the motion judge upheld the search as one incident to an arrest. The problem with this analysis is that the defendants were not arrested at the time of the search or at a time "substantially contemporaneous" thereto. *New York* v. *Belton*, 453 U.S. 454, 465 (1981). See *Commonwealth* v. *Alvarado*, 420 Mass. 542, 554 (1995). The judge noted correctly that a suspect need not be formally under arrest at the precise moment of a search incident to an arrest; the search may precede the formal arrest so long as probable cause exists independent of the results of the search. *Commonwealth* v. *Johnson*, 413 Mass. 598, 602 (1992). However, the search and the arrest still must be roughly contemporaneous.[5] See *Rawlings* v. *Kentucky*, 448 U.S. 98, 111 (1980) (formal arrest "followed quickly on the heels" of search); *Commonwealth* v. *Brillante*, 399 Mass. 152, 154 n.5 (1987) (formal arrest "immediately after" search). Compare *Commonwealth* v. *Alvarado*,

---

[5]Any statements seemingly to the contrary by the Appeals Court in *Commonwealth* v. *Mantinez*, 44 Mass. App. Ct. 513, 517-518 (1998), are dicta, as the search in that case was not upheld as incident to an arrest.

*supra* (search two hours after arrest not incident to arrest). A search incident to an arrest is a limited exception to the warrant requirement, justified by "the need 'to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence." *New York* v. *Belton, supra* at 457, quoting *Chimel* v. *California,* 395 U.S. 752, 763 (1969). To permit a search incident to arrest where the suspect is not arrested until much later, or is never arrested, would sever this exception completely from its justifications.[6] See *Commonwealth* v. *Alvarado, supra.* It would, in effect, create a wholly new exception for a "search incident to probable cause to arrest." This we decline to do.

The Commonwealth urges, alternatively, that we uphold the exit order and patfrisk as part of a routine traffic stop. However, under our State Constitution, neither an exit order nor a patfrisk can be justified unless "a reasonably prudent man in the policeman's position would be warranted in the belief that the safety of the police or that of other persons was in danger." *Commonwealth* v. *Gonsalves,* 429 Mass. 658, 661 (1999). *Commonwealth* v. *Vazquez,* 426 Mass. 99, 102-103 (1997). Here the judge found specifically that the defendants did nothing to cause the troopers concern for their safety.[7] The Commonwealth argues that, because the defendants were suspected of involvement with narcotics, the danger to the officers should be presumed. We acknowledge the cases that have noted a connection between drugs and guns. See, e.g., *Commonwealth* v. *Cannon, ante* 462, 470 (2007); *Commonwealth* v. *Hines, ante* 183, 189 (2007); *Commonwealth* v. *Riche,* 50 Mass. App. Ct. 830, 833 & n.6 (2001), and cases cited. Yet while drug involvement

---

[6]It would also conflict with G. L. c. 276, § 1, which limits the purpose of a search incident to an arrest to "seizing fruits, instrumentalities, contraband and other evidence of the crime for which *the arrest has been made,* in order to prevent its destruction or concealment; and removing any weapons that the *arrestee* might use to resist arrest or effect his escape" (emphasis added).

[7]Police officers' concern for their safety need not be shown by direct testimony, but rather "can be inferred from all the circumstances." *Commonwealth* v. *Fitzgibbons,* 23 Mass. App. Ct. 301, 306 n.5 (1986), citing *Commonwealth* v. *Ballou,* 350 Mass. 751, 756-757 (1966), cert. denied, 385 U.S. 1031 (1967). Here, however, no such circumstances were present, and in fact, Trooper Sloan stated explicitly that she did *not* fear for her safety.

certainly may be a relevant factor in assessment of threats to police safety, we are reluctant to adopt a blanket rule that all persons suspected of drug activity are to be presumed armed and dangerous for constitutional purposes. See *Commonwealth* v. *Rodriguez*, 415 Mass. 447, 450 (1993) (fact that drugs are involved is insufficient, in itself, to justify "no-knock" warrant). Thus, we do not uphold the search on this basis.

We may affirm the denial of a motion to suppress on any ground supported by the record, *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997), and in this case, the search was amply justified by probable cause and exigent circumstances. In *Cupp* v. *Murphy*, 412 U.S. 291, 295-296 (1973), the United States Supreme Court recognized that imminent loss of evidence presents exigent circumstances justifying a warrantless search or seizure. In that case, the defendant had gone to the police in connection with the strangulation murder of his wife. *Id.* at 292. It was undisputed that the police had probable cause to arrest him. *Id.* at 293. However, without a formal arrest or a warrant, and over the defendant's protest, the police took scrapings from the defendant's fingernails that yielded incriminating physical evidence. *Id.* at 292. In upholding the search, the court held that because the police had probable cause to arrest, and because the evidence under the defendant's fingernails would have been lost or destroyed if the police had delayed, the circumstances justified a limited search "to preserve the highly evanescent evidence." *Id.* at 296.

This exception was applied by the Appeals Court in a carefully reasoned opinion in *Commonwealth* v. *Skea*, 18 Mass. App. Ct. 685 (1984). There, the police had probable cause to arrest the defendant for possession of marijuana, but did not do so.[8] *Id.* at 689-690. Instead, they searched the defendant's person for more marijuana or other controlled substances,[9] and found a package of diamonds that ultimately were determined to be stolen. *Id.* at

---

[8]"This was in accordance with their informal policy not to arrest for possession of small amounts of mari[j]uana unless a search revealed further or more serious drugs." *Commonwealth* v. *Skea*, 18 Mass. App. Ct. 685, 687 (1984).

[9]"It is widely accepted that the discovery of some controlled substances gives probable cause to search for additional controlled substances in the vicinity." *Commonwealth* v. *Skea*, *supra* at 690 n.8, citing *Commonwealth* v. *Blatz*, 9 Mass. App. Ct. 603, 604-605 (1980). See *Commonwealth* v. *Dolby*, 50

686-687. The court observed that any further marijuana or other drugs on the defendant's person would most likely have been lost or destroyed before a warrant could be obtained. *Id.* at 691-692. Because there was probable cause to arrest and the "police action literally [had to] be 'now or never' to preserve the evidence of the crime," *id.* at 694, quoting *Roaden* v. *Kentucky*, 413 U.S. 496, 505 (1973), the court upheld the search under the *Cupp* rationale. *Id.* at 697-698.

We recognize that it is possible to read the *Cupp* decision more narrowly than the Appeals Court did in its *Skea* opinion — for instance, as applying only to evidence as "highly evanescent" as the fingernail scrapings in the *Cupp* case, which were subject to "physical dissipation." *People* v. *Evans*, 43 N.Y.2d 160, 167 (1977). Yet we agree with the *Skea* court that there is no principled reason not to apply the same rationale to any evidence likely to vanish before a warrant is obtained. See *Commonwealth* v. *Skea, supra* at 697-698; 3 W.R. LaFave, Search & Seizure § 5.4(b), at 195 (4th ed. 2004) ("At a minimum, *Cupp* should be applied so as to permit, when there are grounds upon which a formal arrest could have been made, a more extensive search for any evidence reasonably believed to be in the possession of the suspect which might be unavailable later"). We note that the *Skea* decision has been cited by the Appeals Court for the proposition that the presence of evidence likely to vanish creates exigent circumstances justifying a warrantless search or seizure upon probable cause.[10] Similarly, most other jurisdictions to consider the question have taken at least as broad an interpretation of the exception in *Cupp*.[11]

In the present case, the police had probable cause to arrest

---

Mass. App. Ct. 545, 551 (2000); *Commonwealth* v. *Allain*, 36 Mass. App. Ct. 595, 602 (1994).

[10]See, e.g., *Commonwealth* v. *Calderon*, 43 Mass. App. Ct. 228, 231 (1997) (jewelry suspected to be stolen); *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596, 599 (1991) (cash proceeds of drug sale).

[11]See, e.g., 3 W.R. LaFave, Search & Seizure § 5.4(b), at 196 n.19 (4th ed. 2004) (collecting cases); *United States* v. *Hall*, 739 F.2d 96, 100 (2d Cir. 1984) (search for marked government funds on defendant's person justified by probable cause and exigent circumstances); *United States* v. *Juarez*, 573 F.2d 267, 274-275 (5th Cir. 1978), cert. denied, 439 U.S. 915 (1978) (same). See also *United States* v. *Banshee*, 91 F.3d 99, 102 (11th Cir. 1996), cert. denied, 519 U.S. 1083 (1997); *United States* v. *Rizzo*, 583 F.2d 907, 910 (7th Cir.

the defendants, having good reason to suspect that they had just participated in an undercover drug purchase. They likewise had reason to believe that the defendants were now carrying the money from this transaction, possibly the only physical evidence of their guilt. Given the fungible nature of money in general, and the tendency of illicit money to change hands quickly, this evidence would never be found if the police did not search immediately.[12] In short, "the police officers' choices were limited to two: search now or never." *Commonwealth* v. *Skea, supra* at 699. Accordingly, the police pat frisked the defendant and found an object in his pocket that turned out to be the very wad of bills they anticipated finding. This was just the type of search upheld in the *Cupp* and *Skea* cases.

The defendants argue that the police officers did not testify that the purpose of the search was to document evidence that would be lost otherwise. However, much like police safety concerns, see note 7, *supra*, a finding of exigent circumstances depends not on the officers' subjective beliefs or motivations, but "upon an evaluation of all the circumstances as they appear to the police at the time." *Commonwealth* v. *Harris*, 47 Mass. App. Ct. 481, 486 (1999), quoting *Commonwealth* v. *Amaral*, 16 Mass. App. Ct. 230, 233 (1983). So long as these circumstances, viewed objectively, justify the police action, "[t]he officer's subjective motivation is irrelevant." *Brigham City* v. *Stuart*, 126 S. Ct. 1943, 1948 (2006). Compare *Commonwealth* v. *Blevines*, 438 Mass. 604, 608 (2003) (officer's subjective purpose in conducting search incident to arrest not relevant).

The defendants argue additionally that, if the police wished to search them, the officers were required to arrest them, and that, if the police believed an arrest would impede the investigation, then they had to forgo the search. See *People* v. *Evans, su-*

---

1978), cert. denied, 440 U.S. 908 (1979); *State* v. *Smith*, 593 A.2d 210, 212-213 (Me. 1991); *State* v. *Moore*, 90 Ohio St. 3d 47, 52-53 (2000), cert. denied, 532 U.S. 908 (2001). But see *Menotti* v. *Seattle*, 409 F.3d 1113, 1152-1153 (9th Cir. 2005); *People* v. *Evans*, 43 N.Y.2d 160, 164-167 (1977).

[12]Even though the money would presumably continue to exist and circulate, it would be only briefly, if at all, in the particular *form* in which the officers could testify to its receipt in the drug transaction: a large wad of cash folded in half. In this regard, the money was just as "evanescent" as the fingernail scrapings in the *Cupp* case or the drugs in the *Skea* decision.

*pra* at 165 ("the police made a deliberate choice that the cover was more important than the immediate arrest of the defendant and they must be bound by that choice"). We do not believe that either the Federal or the State Constitution forces the police to such a Hobson's choice.

First, it is clear that the police need not arrest a suspect the moment they obtain probable cause. *Commonwealth* v. *Piso*, 5 Mass. App. Ct. 537, 541 (1977). See *United States* v. *Lovasco*, 431 U.S. 783, 793 (1977) ("In some instances, an immediate arrest or indictment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing lawbreakers to justice"). Thus, where the police have legitimate reason not to arrest an individual, it is illogical to require them to inflict this greater deprivation of liberty "to justify the lesser intrusion of a search." *Commonwealth* v. *Skea*, *supra* at 694. Requiring police to arrest a suspect to justify a search would paradoxically "turn an arrest into a constitutional safeguard" against warrantless searches. *Commonwealth* v. *Feyenord*, 62 Mass. App. Ct. 200, 210 (2004), *S.C.*, 445 Mass. 72 (2005).

Furthermore, in analyzing whether probable cause and exigent circumstances justified a particular search or seizure, we ask only two questions: whether there was probable cause, and whether exigent circumstances were present. See *Commonwealth* v. *Haefeli*, 361 Mass. 271, 281 (1972). To demonstrate exigent circumstances, the Commonwealth must show that "the situation facing the officers [was] such that it was impracticable for them *to get a warrant*" (emphasis added), *Commonwealth* v. *Cast*, 407 Mass. 891, 904 (1990); the Commonwealth need not also negate the possibility that some other exception to the warrant requirement, such as a search incident to arrest, could have been used to effectuate the search.

Here, as discussed *supra*, there was probable cause, and obtaining a warrant would not have been feasible. This is not a case where "the exigency is . . . itself the product of police delay." *Commonwealth* v. *Skea*, *supra* at 693. The police in this case did not simply fail to obtain a warrant until it was too late. Cf. *Commonwealth* v. *Sergienko*, 399 Mass. 291, 297 (1987). Significantly, it was Garafolo, and not the defendants, whom

the police investigation was targeting; he was the only participant in the April 18, 2001, drug transaction whose identity was known and whose presence was fully anticipated. The police were not aware in advance that the defendants would be at the bar. Information such as the defendants' identities and the extent of their involvement with Garafolo — the type of information that would be helpful in obtaining a warrant — was unknown; indeed, ascertaining this information was the very reason that the defendants were stopped. Because there was probable cause, and obtaining a warrant was impracticable under the exigent circumstances occasioned by the impending loss of evidence, the search was constitutionally permissible.

*Admission of hearsay statements of coventurer.* The defendants also appeal the admission at trial of the trooper's hearsay testimony of certain statements made by Garafolo in the course of the April 18, 2001, drug deal. At trial, the trooper testified to Garafolo's statements that he was going to meet his suppliers in the restroom of the bar to conduct the transaction, and his statement to the trooper, upon exiting the restroom, that they were "all set." There was no objection by defense counsel, and no request for a limiting instruction, and thus the statement became admissible for all purposes. *Commonwealth* v. *Keevan*, 400 Mass. 557, 562 (1991). Indeed, the statements were used by defense counsel on cross-examination of the trooper.

In any event, there was ample evidence justifying the application of the hearsay exception for statements of a coventurer. See *Commonwealth* v. *Borans*, 379 Mass. 117, 146 (1979). "[E]xtrajudicial statements of coconspirators or joint criminal venturers may be admissible against the others involved if the existence of the conspiracy or joint venture has been shown by other evidence." *Commonwealth* v. *Cruz*, 430 Mass. 838, 844 (2000). "[A]n adequate probability of the existence of the common venture, including participation by the given defendant, [must] be established as a preliminary matter," *id.*, quoting *Commonwealth* v. *White*, 370 Mass. 703, 709 n.7 (1976); that is, "the Commonwealth must satisfy the judge by a preponderance of the evidence that a criminal joint venture took place between the declarant and the defendant." *Commonwealth* v. *Cruz, supra.* The statements must also have been made during the pendency of the

criminal enterprise and in furtherance of it. *Commonwealth* v. *Borans*, *supra* at 146. Here, there was testimony of direct observation by the police, independent of the hearsay, that the defendants and Garafolo were engaged in a joint venture at the times of the drug transactions, and that Garafolo's statements were in furtherance of that venture.

It is true that "[w]hen hearsay statements of an alleged joint venturer are to be used against a defendant, the jury should be instructed that they may consider the statements only if they determine on the basis of independent nonhearsay evidence that a joint venture existed."[13] *Commonwealth* v. *Cartagena*, 32 Mass. App. Ct. 141, 144 (1992). However, the trial judge was not required, sua sponte, to provide a limiting instruction where there was no objection to the testimony and no instruction was requested. Indeed, calling further attention to the hearsay statements by a limiting instruction could have undermined the strategy of defense counsel. When the failure to give a limiting instruction is raised for the first time on appeal, we review for a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Nascimento*, 421 Mass. 677, 681 (1996); *Commonwealth* v. *Keevan*, *supra* at 562. We find no such risk here.

*Sufficiency of evidence of codefendant's liability as principal.* The judge instructed the jury that they could find the defendants guilty on a joint venture theory, but that this theory applied only to the April 18, 2001, transaction. The codefendant, who was also charged in connection with the March 27, 2001, transaction, claims that this allowed the jury to convict him only as a principal on that count, and that the evidence was insufficient to do so. Notwithstanding the fact that the codefendant's motion for a required finding of not guilty was generally phrased and did not address principal liability specifically, his present claim of insufficient evidence of principal liability invokes the possibility of a substantial risk of a miscarriage of justice (i.e., a conviction on insufficient evidence), and requires review. We

---

[13]"The threshold determination of this question is for the trial judge; ultimately, however, the jury 'must make definite findings on the same questions which the judge must pass on before he may permit the jury to consider whether that evidence may be used against all.' " *Commonwealth* v. *Soares*, 384 Mass. 149, 159-160 (1981), quoting *Commonwealth* v. *Beckett*, 373 Mass. 329, 340 (1977).

conclude that there was sufficient evidence to convict the codefendant as a principal. The judge instructed the jury that the crime of trafficking in more than twenty-eight grams of cocaine requires (1) that the substance be cocaine; (2) that the defendant distribute some perceptible amount of it; (3) that the defendant act knowingly or intentionally; and (4) that the amount of cocaine or mixture containing cocaine be twenty-eight grams or more. See G. L. c. 94C, § 32E (*b*) (2). Given the evidence that the codefendant delivered the package of cocaine to Garafolo to give to the trooper on March 27, 2001, there was no substantial risk of a miscarriage of justice.

*Judgments affirmed.*